980 F.2d 731
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Edward L. OHLSON, Defendant-Appellant.
 No. 91-3710.
 United States Court of Appeals, Sixth Circuit.
 Nov. 24, 1992.
 
 Before DAVID A. NELSON, ALAN E. NORRIS and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant, Edward Ohlson, appeals his jury convictions for nineteen counts of wire fraud, mail fraud, loan application fraud, and credit card fraud. He asserts that the district court erred by denying his motion for a continuance of the trial date and by refusing to allow a defense witness to testify about a particular subject. Finding these contentions without merit, we affirm the convictions.
 
 I.
 
 2
 In 1987, defendant, a psychologist, began a "financial service business" in Beachwood, Ohio. He represented to numerous individuals that for a non-refundable "advance fee" of $10,000, he could secure for them loans or business capital. In order to attract clients, Ohlson claimed that he had arrangements with well-known securities firms; that he held a diplomatic position in Canada representing the Republic of Sierra Leone; and that he could use this position to access funds controlled by the latter country. All these claims were false, but Ohlson made them in the course of collecting advance fees in excess of $175,000 from clients who never received the financing he promised.
 
 
 3
 As time progressed and clients pressed Ohlson, he refunded small amounts of some clients' funds to dissuade them from contacting law enforcement officials, gave others checks drawn on insufficient funds, and falsely represented to others that he was attending closings that would provide funds.
 
 
 4
 By June 1989, Ohlson had begun to seek loans from banking institutions. He tried to secure a $1.8 million loan from a bank in Virginia, purportedly to renovate the Sierra Leonean Embassy in Washington, D.C. In order to obtain that loan, he submitted a financial statement falsely representing that he and his wife had a net worth of $160 million. Ohlson also submitted this false financial statement to a bank in Denver, Colorado, in an attempt to obtain a $2.7 million loan. Both loan applications were rejected when he failed to deposit the required collateral.
 
 
 5
 In December 1989, Ohlson deposited counterfeit stock certificates into a brokerage account in order to secure a margin loan of approximately $65,000.[1] In August 1990, Ohlson devised yet another scheme whereby two new clients would send bogus accounts receivable documentation through a previous Ohlson client, John J. Buehner, who would attempt to factor the false accounts through his employer. Ohlson was to receive a percentage of the gross amount of the accounts receivable. Buehner, however, was secretly cooperating with federal authorities, and recorded conversations with Ohlson.
 
 
 6
 On February 6, 1991, a federal grand jury indicted Ohlson on twelve counts of wire fraud in violation of 18 U.S.C. § 1343 and two counts of mail fraud under 18 U.S.C. § 1341 in connection with his advance fee scheme. He was also charged with two counts of making false statements in a credit application to a federally insured bank in violation of 18 U.S.C. §§ 2 and 1014 in connection with his loan applications to the two banks. The indictment further charged one count of securities counterfeiting in violation of 18 U.S.C. §§ 2 and 513 and one count of conspiracy to factor false accounts receivable under 18 U.S.C. § 371. The final charge was that Ohlson fraudulently obtained and used a credit card in violation of 18 U.S.C. § 1029(a)(2).
 
 
 7
 Ohlson pleaded not guilty to all nineteen counts and, at his request, received a court-appointed attorney. The court set the trial for April 1, 1991, but on March 13 continued the trial until April 15 and scheduled oral arguments on defense motions for April 5. Prior to the April 5 hearing, Ohlson's attorney, John Quillin, moved for a continuance, which the district court denied.
 
 
 8
 On April 10, the district court received a letter from Ohlson which it treated as a pro se motion for a continuance. In the letter, Ohlson acknowledged that his attorney was competent, but said he did not feel that Quillin was sufficiently prepared for trial. He requested that the court "appoint a new attorney or give [his] attorney time to prepare the case as it should be." In response to this letter, the district judge conducted a hearing on April 11 and decided to appoint an additional defense attorney, George Keith, in view of the difficulty of the case. The judge denied the motion for a continuance, however, because he believed there had been adequate interaction between Ohlson and Quillin, and because there were four days remaining before the trial was to begin, and even more time before significant testimony would be taken.
 
 
 9
 At trial, Ohlson sought to introduce the testimony of John Fuhr, a veterinarian who claimed to have experience in the feasibility of foreign government financing. When Fuhr began to testify about a financing program with the government of Angola, the government objected on the ground of relevance. The district court decided to voir dire Fuhr's proposed testimony out of the hearing of the jury. When the witness was unable to provide the complete names or accurate locations for the banks with which he claimed to have been dealing, the district judge sustained the government's objection, refusing to permit the witness to testify about the feasibility of foreign government financing.
 
 
 10
 After a two-week trial in which both Quillin and Keith represented Ohlson, the jury convicted him on all nineteen counts. This timely appeal followed.
 
 II.
 
 11
 Ohlson first argues that the district court's refusal to grant a continuance denied him a fair trial. Because the grant or denial of a of continuance is within the discretion of the trial judge, we will reverse a district court's decision only upon a showing of abuse of that discretion. United States v. Martin, 740 F.2d 1352, 1360 (6th Cir.1984). To determine if there has been an abuse of discretion, this court examines whether the defendant suffered any actual prejudice, that is, whether "additional time would have produced more witnesses or have added something to the defendant's case." Id. at 1361.
 
 
 12
 Ohlson has failed to make any specific showing of prejudice; instead, he merely argues that his attorneys[2] required more time because of the "complexity of the case." No demonstration has been made that additional time was required to obtain evidence not available within the time allowed. As the Martin decision noted, "[e]very lawyer on the losing side of a case probably feels that if he had had a little more time, he might have done something else which would have been helpful." Id. (quoting Sykes v. Virginia, 364 F.2d 314, 316 (4th Cir.1966)). On the record before us, we are unable to say that the district court abused its discretion by failing to grant the requested continuance.
 
 III.
 
 13
 Ohlson also contends that the district court erred in sustaining the government's objection to defense witness Fuhr's testimony about "the feasibility of foreign government financing." A district court's rulings on the relevance of proffered evidence will not be reversed unless there has been an abuse of discretion. See United States v. Hickey, 917 F.2d 901, 904 (6th Cir.1990).
 
 
 14
 The district court's voir dire examination clearly pointed out that Fuhr's proffered testimony was irrelevant to the cause being tried. Fed.R.Evid. 401 defines "relevant evidence" as that having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fuhr's proffered testimony dealt with the feasibility of the foreign government financing that Ohlson claimed to be undertaking. However, the government's allegations of fraud did not turn on whether it was feasible for someone to successfully accomplish the financing scheme Olson had described to clients, but on whether that financing program actually existed. Therefore, the district court did not err in concluding that the theoretical "feasibility" of such a scheme was irrelevant to whether Ohlson was guilty of fraud.
 
 
 15
 Furthermore, Fuhr demonstrated a striking ignorance concerning some of the fundamental aspects of the subject matter about which he sought to testify:
 
 
 16
 THE COURT: Where is the bank located?
 
 
 17
 THE WITNESS: I'm not sure I can tell you that, sir. I'm really not sure I can tell you that.
 
 
 18
 ....
 
 
 19
 THE COURT: This money's going to go from the African bank. You don't know where it's located?
 
 
 20
 THE WITNESS: No, the NED Bank, that's African NED Bank.
 
 
 21
 THE COURT: What does NED stand for?
 
 
 22
 THE WITNESS: N-e-d. I can't tell you--national something, but I don't know.
 
 
 23
 From this exchange, the district court could readily conclude that Fuhr lacked the "knowledge, skill, experience, training, or education" required to offer expert opinion testimony on international finance. See Fed.R.Evid. 702.
 
 IV.
 
 24
 For these reasons, the judgments of conviction and sentencing are affirmed.
 
 
 
 [1]
 The details of this transaction are contained in the unpublished opinion affirming co-defendant Mason Knabe's conviction. United States v. Knabe, No. 91-4044, 1992 WL 113368 1992 U.S.App. LEXIS 13287 (6th Cir. May 28, 1992.)
 
 
 [2]
 While one of defendant's attorneys joined the defense team only four days prior to trial, he was the second defense attorney who worked on the case, and presumably had access to his co-counsel's earlier preparation efforts. In any event, defendant has not contended that either attorney's representation fell below "an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 687-88 (1984), nor that there was a "breakdown in the adversarial process that would justify a presumption that [defendant's] conviction was insufficiently reliable to satisfy the Constitution." United States v. Cronic, 466 U.S. 648, 662 (1984). We therefore see no merit in defendant's Sixth Amendment argument